Raritan Water Power Co. *v.* Veghte.

The Raritan Water Power Company, appellants, and Veghte and others, respondents.

1. The right to divert water is an incorporeal hereditament, and at the common law, could only be created by deed. But when a charter of a water power company gives a right to divert the water of a river, upon the *written consent or permission* of those owning lands and water privileges, such written consent obtained after the act, with the assistance of the act, operates as a substitute for the common law method, and has the effect of granting to the company a legal right to divert.

2. If such consent was in fact, however, obtained previous to the grant of the charter, it was a license merely. But when such license has been executed upon the lands of the licensor, and permanent works and improvements erected in pursuance thereof, at great expense, equity will not, to the extent that the license is executed, disturb it, or permit its revocation.

3. Where improvements of a permanent nature have been made by a person on his own land, the enjoyment of which depends upon a right recognizable by the law, affecting the land of another, and to which his consent is necessary, and where such consent is expressly proved, or necessarily implied from the circumstances, and the improvements have been made in good faith upon it, equity will not permit advantage to be taken of the form of the consent, although not according to the strict mode of the common law, or within the statute of frauds; and to defeat such a purpose will, upon proper bill filed, enjoin the licensor from accomplishing his fraud, or when he asks relief it will be refused, or if granted, will be allowed merely in the shape of compensation, but protecting the right of the licensee.

4. The measure of the execution of the license, in this case, is the capacity of the dam and canal as originally constructed, regarding the culverts only as a means of supply, according to the necessity of business, and liable to any change in their location or construction, the better to enjoy the benefit of the dam and canal as originally built and completed, the equity being that the defendants shall, if necessary, have the full use of the expenditure made on the faith of the consent within its terms, and depending upon it.

5. An equitable estoppel will affect a subsequent purchaser to the same extent as his grantor, when he has had actual notice of the condition of things upon which it is based, or when the circumstances are such as to put him upon inquiry to ascertain the facts.

6. To constitute an abandonment, the facts or circumstances must clearly indicate such an intention. Abandonment is a question of intention. Non user is a fact in determining it, but though continued for twenty years, is not conclusive evidence, in itself, of an abandonment. Its weight must always depend upon the intention to be drawn from its duration, character and accompanying circumstances.

The opinion of the Chancellor is reported in 4 *C. E. Green* 142.

*Mr. Williamson* and *Mr. J. Wilson,* for appellants.

*Mr. Dodd* and *Mr. Bradley,* for respondents.

The opinion of the court was delivered by

BEDLE, J.

The appellants are the owners of a dam and water power on the Raritan river, at Raritan, in Somerset county. The same formerly belonged to the Somerville Water Power Company, a corporation incorporated February 28th, 1840. The latter company mortgaged their whole property and franchises in 1848, to secure certain bondholders, which mortgage was afterwards foreclosed by them in the United States Circuit Court, and the whole property, franchises, &c., purchased by the bondholders; which bondholders afterwards (March 25th, 1864,) conveyed the same to the appellants, they having been incorporated as the Raritan Water Power Company, March 24th, 1863, and fully authorized to purchase, possess, and enjoy, all the real estate of the Somerville Water Power Company, including the canal, head gates, water power, water rights, franchises, &c. The Raritan Water Power Company are now the owners of all such property, rights, and franchises, as were owned by the Somerville Company.

The bill was filed against the Raritan Company, by seven different owners of land along the river, two of whom are above the dam, one at the dam on each side, and the other four are below the dam. The bill complains that the company had raised their dam, and were about to tighten and further raise it; also, that they were about to change the location of the head gates of their canal, and to enlarge their size, and by these acts to increase the quantity, and to divert more water than they are entitled to. The water power consists of a dam across the river, and a canal about

three miles in length, on which are erected some mills and factories, and which are supplied with water by means of said canal. The owners above the dam could be affected only by an increase of water, if the dam was too high, while those below would, by the increased height of the dam and the size of the gates, be affected only in the diminution of water in the river through their lands. The decree determines that the Raritan Company are entitled to maintain, make perfectly tight, and keep in repair their dam, at such height as to raise the water of the river at the place of the dam, two and a half feet at its ordinary level prior to the erection of the dam; and the Chancellor not being satisfied that they had raised, or intended to raise the same to any greater height, the bill was dismissed as to two of the complainants, Wever and John Veghte, they being owners above the dam. And as to the owners below the dam, *viz.* Rynear H. Veghte, Hope, Stryker, Frelinghuysen, and Crater, (said Crater being an owner both below and above the dam) it was decreed that the defendants, their successors and assigns, be perpetually enjoined and restrained from increasing the capacity of their raceway and trunks, from diverting water from said river, beyond the capacity of their works for that purpose as constructed in or about the year 1843, by any hydraulic means or devices, or by changing the height, capacity, or position of said trunks, or the depth or capacity of said raceway, or the level of water therein, except as the reduction of said level may be incidental to the fair use of said water in applying the same to the production of manufacturing power at the lower end of said raceway where the same is wont to be applied; and also restraining the defendants from diverting the water of said river in such manner as to prevent a sufficient quantity of water from flowing at all times in the channel of said river, below said dam, for the use of the five complainants last named, and those who may occupy their lands, for all agricultural and other useful purposes for which they have heretofore been used. The date (the year 1843) fixed in the

decree, refers to the time when the present trunks or culverts, through which the water is communicated from the pond to the canal, were built. The defendants appealed from the whole decree, except as to the dismissal of the bill against Wever and John Veghte, and the complainants presented a cross appeal, on the ground that the defendants should have been enjoined from diverting any more water than has been diverted for and during the twenty years next preceding the filing of the bill. There is not much practical difference between the decree and the limitation by user mentioned in the cross petition, and the whole case may be disposed of on the defendants appeal, the chief question being to what extent they may divert the water of the river, as against the complainants below the dam, taking the dam at the height indicated by the Chancellor, and tightened, as in his decree mentioned.

John I. Gaston and others, who are the corporators of the Somerville Water Power Company, were associated together, previous to their incorporation, as owners of certain real estate on Raritan river, below the present dam, and including a dam and water power, known as the Dawes or Vandoren dam. The same had been erected under an act of the legislature of February 16th, 1820, and the purchase of which was afterwards made by the associates. By this water power, I believe, two grist mills and an oil mill were run. The associates being desirous of increasing their power, establishing factories, and building up a manufacturing town at the place now called Raritan, commenced, in the year 1839, the erection of the present water power, and while the same was in progress, obtained from the legislature their act of incorporation of February 28th, 1840. The preamble of this act recites the fact of ownership by the associates of their lands and water rights on the Raritan, with the right to erect and maintain the Vandoren dam, pursuant to the act of February 16th, 1820, entitled " an act to enable Jacob Vandoren to erect a mill dam across the Raritan river," and that " the said John I. Gaston and his

associates are desirous to increase said water power, for the establishment of manufactures, by diverting the water of said river from its accustomed channel into a canal to be constructed for that purpose, and have already incurred great cost and expense in effecting that object, and have represented that the same can be effected with the voluntary consent of the owners of land through which said canal is contemplated to be cut, and also of all others whose interests may in anywise be affected by the execution of said project," &c. Under this act the Somerville Water Power Company were authorized to erect and build a dam across the river Raritan, opposite the lands of John H. Vandoren and Willet Taylor (which is the present dam), provided the voluntary consent of the owners of said lands should be first obtained, and provided also, that the said dam shall be so constructed as not to raise the water more than two and a half feet above its ordinary level, the said company to be answerable to owners of land and water privileges above said dam for damages arising from overflowing and backwater; also to cut a main raceway or canal from the said dam to any point on the said Raritan river betwixt the present dam, commonly known as Vandoren's dam, and a point half a mile below the covered bridge crossing said river, of such dimensions and depth as said company may see proper; and also to cut and erect as many lateral or branch raceways, locks, weirs, gates, and other works from said main raceway to the river as the said company shall deem expedient, for the purpose of creating and using the said water power for mills, manufacturing, or other purposes connected with the objects of the act; said lands for said main and lateral raceways not to be taken without the consent and permission of the owner, and satisfaction made or agreed on for damages; a map of location of the dam and route of the main raceway to be deposited in the Secretary of State's office; and further, "that when the said dam and raceway shall be completed, it shall be lawful for the said company to divert the waters of the river

Raritan, or so much thereof as may be necessary for the purposes of this act, from their natural channel into the said main raceway, and cause them to be again returned to said natural channel, in such way as the said company may deem most expedient; provided always, that it shall not be lawful for said company to make such diversion until they shall have obtained written consent and permission to do so from the owner and owners of all lands lying on said river Raritan, between said dam and the point where the said main raceway again intersects said river."

The canal was made on the north side of the river, and the following were the owners of lands on the south side, whose consent to the diversion of the water was necessary, commencing at the dam : Willet Taylor, Lawrence V. Davis, Joseph V. D. Vredenburgh, John Van Middlesworth, Garret Van Middlesworth, Peter B. Dumont, James Quick, and Catharine Veghte; all of whom are now dead, except Davis and Vredenburgh, and all of whom were alive while the dam, canal, and works were in process of construction, and until after their completion. Davis and Vredenburgh, the survivors, are not complainants in this cause, but they were witnesses, and their consent to the erection of the water power is clear. The Taylor land is now owned by the complainant, Crater; the Van Middlesworth farms by the complainant Stryker; the Dumont farm, mostly by the complainants, Frelinghuysen and Hope; the balance of the Dumont farm, and the Quick farm, by L. E. Rice, who is not a complainant, (it being very clear that Quick gave his consent) ; and the Catharine Veghte farm, by the complainant, Rynear H. Veghte. The defendants set up in their answer, that all the owners at the time of the erection of the water power, under whom the complainants claim, together with the others to be affected on the south side of the river, signed a written consent to the erection of the dam, and the diversion of the water. The first question then arises, was such consent signed ? There is no doubt from the evidence, that in or about the year 1839 or 1840,

there was in existence a written paper, purporting to be signed by all the owners on the south side of the river, giving such consent. The evidence is entirely clear and direct, as to the genuineness of the signatures of Taylor, Davis, Vredenburgh, Dumont, and Quick, five of the owners, and as to the other three, the Van Middlesworths, and Catharine Veghte, the facts and circumstances, though not so direct and conclusive, are sufficiently clear to conclude that their signatures were also genuine. The Chancellor so held as a matter of fact, and I have no doubt from the evidence that such was the case. It must, therefore, be taken as a fact, that a paper of the description stated, was signed by all the owners on the south side of the river, under whom the complainants derive their titles. That paper has been lost, but sufficient evidence has been produced to permit proof of its contents. The precise date of the paper is not shown, neither is it absolutely certain from the evidence before us, whether it was signed before or after the date of the charter, (February 28th, 1840). The weight of the testimony is, that it was signed before that time, and just previous to the commencement of the works. If signed after the charter, as the statutory consent, the *written* consent or permission upon which the company were authorized to divert the water, then it, in connection with the act of the legislature, would be sufficient to create the right to divert as a legal title. It is true, that such right would be an incorporeal hereditament, and could be created at the common law only by deed, it being a right not lying in livery, but in grant, yet a deed is only a mode by which it may be created, exclusive of course at the common law, but subject to statutory change. The meaning of the words " written consent or permission" in the charter, is a question of construction merely. The statute was intended to substitute for, or make equivalent to, the common law mode of conveying the right, a mode with the assistance of the act, simply by writing, not by deed. The case of *Hetfield* v. *The Central Railroad Company*, in this court, 5 *Dutcher* 571, does not

conclude this result. The charter in that case made the taking of land conditioned upon the payment of damages, "unless the *consent* of the owner or owners of such lands be first had and obtained." No mode of consent was indicated. The act was general, and Justice Elmer, in his opinion, states that that provision was entirely consistent with the previously existing law, and was framed with reference to it; it was therefore held in substance, that verbal consent was not sufficient to give title to the railroad company, that it amounted only to a license, revokable at law. It is a rule, that when a statute directs anything to be done, and does not appoint any special manner, it shall be done according to the common law. *Bac. Abr.* (Bouvier's ed.) *Statutes; Saville* 59. That rule would justify the application of the common law mode of acquiring the consent mentioned in the Hetfield case; but when a *manner* is stated, written consent, it would seem to be clear that the statute was intended to make that, with the aid of the statute, a sufficient grant of the right to be enjoyed. There would appear to be no reason why that mode of consent was stated, if it was intended that the right should only be acquired by deed at the common law.

There is a significancy in the use of the words, "*written consent or permission*," in the charter before us, as the basis of the right to divert. In the 8th section, the company cannot take or occupy lands for the raceways, without "*the consent and permission*" of the owners, leaving out the word *written*, and in the 7th section, the dam cannot be erected without "*the voluntary consent*" of the owners of the lands where erected. These words are general, and the rights to be acquired are corporeal, and would naturally be based upon an estate of fee simple, and the title would have to be acquired by deed, as was done by the company for the site of their dam and raceways, but concerning the incorporeal right of diverting water, the mode of acquiring it from the various owners affected by the diversion, was simply by writing, not by deed alone. If the words "consent and

permission" had only been used in the section authorizing the diversion, the case of Hetfield would apply, but a "written" consent with the aid of the statute, is equivalent to the deed at common law, to the full extent of the interest intended to be secured. The construction of this feature of the act is important, as there are various acts concerning plank, turnpike, and other roads, and dams, providing for written consents, and any other construction might seriously affect the legal rights, which I think such consents, by authority of the legislature, were intended to secure. If, then, the written consent of the owners to the diversion was obtained after the act, it, with the act, must have had the effect of granting to the company a legal right to divert to the full extent of its terms.

But as already stated, the weight of the evidence is in favor of the fact that it was obtained just previous to the commencement of the work, and on that basis it becomes necessary to inquire what effect, in connection with the erection of the works, it will have in equity. The complainants seek to enjoin the defendants from any greater diversion than has been made since 1843, when the present trunks or culverts were put in. These are two in number, three feet by four each, about thirty feet in length, and placed about fifteen inches below the average level of the water in the pond. The canal is about three miles in length, running from the pond on the north side of the river, opposite the land owners on the south side, already mentioned, and emptying through a waste-weir and a tail-race into the river below. The canal was constructed thirty feet wide at the bottom, and forty-three and a half feet at the top, with an average depth of four and a half feet, except at the lower end, where it was probably more. There are two reservoirs upon it of considerable dimensions, and a guard bank on the river side along the canal, to protect it from freshets. The present trunks or culverts were put in in place of two sluice ways, covered over with about a foot of earth, forming part of the embankment of the canal, which were a little

more than one-half the capacity of the present trunks; they were in but a short time, probably a year, and were intended only for a temporary purpose, and to sufficiently supply the mills then upon the water power. After the same had been put in, other mills were erected, and to meet the additional immediate and prospective wants, the present culverts were inserted. The sluice ways that remained about a year, were built only, as appears from the evidence, for a temporary purpose, and had no relation to the capacity of the canal or the supply from the pond, and such was evidently the case, too, with the last ones. Both sets of culverts were a departure, for present needs only, from the first design of building large gates across the head of the canal, sufficient for a supply to its full capacity. That design was carried out, for the evidence shows that the work on the canal, the digging, was commenced May 12th, 1839; that the head gates were commenced about in June, 1839, and finished the latter part of that year, the work taking five or six months; that the dam was commenced about the latter part of 1839; that the work on the canal progressed with great rapidity in the year 1839, so that by the end of 1839, some parts of the canal were finished; that the work on the dam and canal was continued on during the years 1840 and 1841, and the water let into the canal in 1842; that before the water power was finished there came a freshet, breaking the bank of the canal in a dozen places, as stated by the witness, and that it took nearly a year to repair the damage. At this freshet the head gates were washed out. These gates were built across the canal, with stone abutments on each side. There were at least eight of them, and perhaps ten; the aggregate of spaces between them for the water, exclusive of the posts, being thirty-three feet and four inches in width, in the opinion of the witness who made them, and the depth from four to five feet. It is evident from the testimony, that whatever their accurate size may have been, they were built of sufficient size to answer the capacity of the canal, in the contemplation of its projectors. Frederick T. Frelinghuysen says, after they were

finished he attempted to walk across them, that his head got dizzy and he abandoned the attempt; and that he thinks the whole width of them was between forty and fifty feet, including the timber between the gates. Andrew Fleming says, that he was down by the head gates after they were put in, and walked across them; that the work was a strong, well made frame, braced from the posts to the bottom sills, and that the ends of the timber work connected to stone walls, one at each end. How long these gates remained in is not clear, but the evidence referred to, with other in the case, shows that they were in the main finished. Theodore F. Mann, the engineer, swears that he was present when they were washed away; that it was on a Sunday night; that the water came over the embankment and washed them away; that it was about the year 1841. David T. Runyon says, that he thinks these gates were washed out in December, but it might have been further along in the winter. He does not give the year. He says, that the water got under the frame work of the head gates, and washed it out, so that the frame work was all kind of turned over or turned upside down; that that is the way the gates laid that winter, and that they went on and filled up the space back of the gates, between them and the river, with flax, tow, and other things, so that they laid in that position until the next summer, when they undertook to take the timber apart and out; that a good deal of it was under the water in the mud; that they got out all they could, then commenced to frame the timber over again to build other head gates; that they raised their bents and were washed out again; that these gates were not as wide as those first put in; that after that they filled up the embankment with earth, dug through the embankment, and put in what they call a trunk. Without referring to the evidence in detail, I think that the weight of it is that the first head gates remained until the winter of 1840 and 1841; that during the summer of 1841, an effort was made to rebuild them of less size, and that failing, the smaller trunks were put in

under the embankment in or about the year 1842, or shortly before, in contemplation of the water being let into the canal for use in that year. But however that may be, the first head gates were erected and substantially finished, and the whole work was then so far developed and in progress, as to exhibit the general extent and scope of the enterprise, and the relation of the gates to it. The whole work was about three years in its construction. When the act was obtained the dam was in course of erection, the head gates had been built, and the canal in progress, and from that time the whole work proceeded, the same being ready for use about the summer or fall of 1842.

Now assuming, as stated, that the consent was obtained before the act of the legislature, which is according to the weight of the evidence, there can be no doubt that the work was carried on, and the large expense necessarily attending it incurred, upon the faith of that paper. The proof of its contents is satisfactory that it gave a right and consent to build the dam for the purpose of a water power company, and to divert the Raritan river, or so much thereof as might be necessary for the accomplishment of the water power. There is no evidence that it was sealed. It was merely a written paper, signed by the owners. Theodore Frelinghuysen swears that he had it, examined it, and read it over carefully, critically, to see if it was sufficient. He is, and was a lawyer at the time, and although interested in the company, his truthfulness is beyond question. His statement of the fact of the paper and its contents, is consistent with the fair inferences to be drawn from the general facts and features of the case, consistent with the evidence of Davis, who signed the paper, and consistent with what would naturally be inferred from the apparent acquiescence of the owners, without objection, in the progress of the work, all of whom (the owners who signed the consent) were living till after its completion. Of the accuracy of Theodore Frelinghuysen's statement of the contents of the paper, so consistent as it is with all the probabilities of the case, I have no doubt. Its terms were

Raritan Water Power Co. *v.* Veghte.

general; to divert the Raritan river, or so much thereof as might be necessary, and they are sufficient to embrace the whole work to the extent of its capacity, even to the diversion of the whole river, if necessary. Upon the strength of that paper the canal and dam were built, and the original gates put in. The work was all on land acquired and owned by the company, not on that of the owners interested in the ·diversion, below the dam. The necessary operation of the works would be to divert water from below; but the works and the land on which constructed were the company's. No question can therefore arise concerning the effect in equity of a license executed on land of the licensor. If we treat this paper simply as a license, the defendants will then stand upon a license executed on their own land by a large expenditure of money in permanent works and improvements, the necessary operation and enjoyment of which will be to divert the water from below, and upon the extent of their right to do which, the utility of the works will depend. It is unnecessary to consider the effect of such a position at law. The equitable rights of the parties are now under inquiry. To the extent that the license is executed, equity will not disturb it or permit its revocation. Where improvements of a permanent nature have been made by a person on his own land, the enjoyment of which depends upon a right recognizable by the law, affecting the land of another, and to which his consent is necessary, and where such consent is expressly proved, or necessarily implied from the circumstances, and the improvements have been made in good faith upon it, equity will not permit advantage to be taken of the form of the consent, although not according to the strict mode of the common law, or within the statute of frauds, and to defeat such a purpose will, upon proper bill filed, enjoin the licensor from accomplishing his fraud, or when he asks relief it will be refused, or if granted, will be allowed merely in the shape of compensation, but protecting the right of the licensee. To this extent, at least, the doctrine here invoked is sustained by the cases. *Rochdale*

*Canal Company* v. *King*, 16 *Beav.* 630; *S. C.*, 7 *Eng. L. & E.* 208; *Duke Beaufort* v. *Patrick*, 17 *Beav.* 60; *Wood* v. *Sutcliffe*, 8 *Eng. L. & E.* 217; *Hulme* v. *Shreve*, 3 *Green's Ch.* 116; *Angel on Water Courses*, § 318, *&c.*; *Rerick* v. *Kern*, and note, 2 *Am. Lead. Cas.* 733; *Wetmore* v. *White*, 2 *N. Y.* Cases *in Error* 87; *Jacox* v. *Clark*, *Walker's Ch.* (*Mich.*) 249; *Payne* v. *Paddock*, *Ibid.* 487.

The written consent shows an intention on the part of those who signed it, that the projectors of the water power should expend their money, build their works, and divert the water of the river as far as necessary. The action of Gaston and his associates, before and after the incorporation, by the large outlay and magnitude of the works, (for in those days they cost from $75,000 to $100,000, the gates alone first erected costing about $1400,) shows that they, in good faith, relied upon that consent; and now to deprive them or their successors of the benefit of it, when it is necessary for the enjoyment of their property, would be so inequitable and unjust, that the court will look beyond mere defects in the legal assurance of the right, and if possible prevent such a result. No compensation can be required in this case from the defendants, as it is evident that either none was intended in money, or if any was agreed on, that it must have been paid to the former owners, and such will be presumed after this lapse of time, there being no evidence to the contrary. It is difficult, however, to resist the conclusion that the consideration to the owners for their consent was not money, but consisted in the taking down of the Dawes dam in the year 1841 or 1842, and thereby relieving much of their land from overflow, also in benefiting the fords, and in addition thereto, the general benefit to the neighborhood by the improvement. The Dawes dam was actually taken down by the company previous to or about the time of the first diversion of the water, and there is strong ground, from the facts, to conclude that that act entered into the motive of the consent, and were it necessary to the rights of the defendants, it might well be held that

they could compel the specific performance of an agreement to that effect.

Giving effect, then, to the consent as executed, the next inquiry is, how far has it been executed? The decree limits it to the culverts of 1843, and now remaining. The great cost of the works was in the dam and canal; the culverts were but of trifling expense. As stated, they were intended for a temporary purpose. They are only the means by which the water is carried from the pond to the canal, having no relation to the capacity of the works, and the size of which may be governed entirely by the needs of power from the canal. The license was to divert as much water as was necessary for the accomplishment of the water power. A very much smaller and less expensive canal would have answered for those culverts, if they were to be taken as the test of the execution. The water power was notoriously intended to encourage and build up manufacturing establishments at Raritan, and the works were erected to meet the expected demand. The measure of the execution of the license is the capacity of the dam and canal, as originally constructed, regarding the culverts only as a means of supply, according to the necessity of business, and liable to any change in their location or construction the better to enjoy the benefit of the dam and canal as originally built and completed, the equity being that the defendants shall, if necessary, have the full use of the expenditure made on the faith of the consent within its terms and depending upon it. This, to my mind, is to be regarded as the scope of the execution. If the equity of the defendants depended upon the presumption of a right by grant, based upon an adverse user of the water, then the extent of the actual user would alone be regarded, but in this case it depends upon the extent of the execution of a license. If, however, we should consider the mode of obtaining the water from the pond to the canal as any test of the execution, then the original gates should be taken as the measure in this cause. They were constructed of large size and probably sufficient for the full

capacity of the canal; the amount of water to be discharged through them to be regulated by the demand. That they were not replaced, does not detract from the effect of the execution as to them, as a part of the work, for, as will be seen, there was no abandonment of the right to put them in again if necessary.

The next question is, whether the same equities exist against the complainants as against those who signed the consent. An equitable estoppel will affect a subsequent purchaser to the same extent as his grantor, when he has had actual notice of the condition of things upon which it is based, or when the circumstances are such as to put him upon inquiry to ascertain the facts. The cases on this point are too numerous to cite; many are collected in the note to *Le Neve* v. *Le Neve*, 2 *Lead. Cas. in Eq.* 127. (See also 2 *Am. Lead. Cas.* 770, 4*th ed.*) Notice is either actual or constructive, and what amounts to constructive notice depends much upon the facts of each case. The recent case of *Hoy* v. *Bramhall* in this court, 4 *C. E. Green* 563, well adopts the general rule " that whatever puts a party upon an inquiry amounts, in judgment of law, to notice, provided the inquiry became a duty, as in the case of purchasers and creditors, and would lead to the knowledge of the requisite fact by the exercise of ordinary diligence and understanding." That case also accepts the rule of Wigram, Vice Chancellor, in *Jones* v. *Smith*, 1 *Hare* 43, that where the party has had actual notice that the property was in fact charged, encumbered, or in some way affected, the court has bound him with constructive notice of facts and instruments, to the knowledge of which he would have been led by an inquiry after the charge, encumbrance, or other circumstances affecting the property, of which he had actual notice; or, as stated in the note to *Le Neve* v. *Le Neve*, 2 *Lead. Cas. in Eq.* 160, gathered from the cases there cited, " whatever is sufficient to direct the attention of a purchaser to the prior rights and equities of third persons, and to enable him to ascertain their nature by inquiry, will operate

as notice." And to show how far this doctrine has been applied, the case of *Hervey* v. *Smith*, 22 *Beav.* 299, is an illustration.

Now, in view of these principles, the complainants and the grantors of such as did not purchase immediately from the representatives of the owners who signed the consent, had actual notice that a considerable part of the water of the river was diverted by the water power. The fact of the diversion, and the cause, they could distinctly see. That it was done by means of the dam and canal, and that several mills and factories were supplied by the water, was apparent. The canal was in sight of their lands, and dependent upon the river for its supply. The necessary effect of its use was to divert water therefrom, and considering its size and apparent design, the slightest drought would have induced the belief that it had not yet been used to the extent of its capacity. Having notice that the river was being diverted in this way, and the scope of the means by which it was done, they were in duty bound to ascertain by proper inquiry, the nature and extent of the right to do it. They failed to make inquiry when they should have done it in justice to the rights of the company, and for their own protection. The complainants, under the facts of this case, are in no better situation than those who gave the consent.

It was further contended, that the defendants had abandoned their right, if any they had, to divert more water than they had used through the present culverts. The act of incorporation allowed the company to divert only as much water as was necessary for the purposes of the act, and such also was the intention of the license. The diversion could not exceed what was reasonably necessary and proper for the time being to supply the demand. Any waste or diversion beyond the demand, would have been an infringement of the rights of the owners below the dam. They were entitled to the natural flow of the water, except only so far as the uses of the company under the license would affect it. The non-user by the company beyond the exist-

ing needs, within the limits of the present culverts, and the consequent flow below the dam, were not inconsistent with each other. The company could not use any more water than the demand required, and whatever was not so used necessarily came to the complainants' land, and in which they had their natural rights. The non-user by the company, and the corresponding flow below the dam, were in harmony. No adverse enjoyment can be set up by the complainants under these circumstances, and the question of abandonment therefore rests simply upon whether the company intended to relinquish their right beyond the scope that it had been exercised with the present culverts. The reason urged to support the abandonment, is non-user beyond those culverts. To accomplish an abandonment, the facts or circumstances must clearly indicate such an intention. Abandonment is a question of intention. Non-user is a fact in determining it, but is not, even for twenty years, conclusive evidence in itself of an abandonment. Its weight must depend upon the intention to be drawn from its duration, character, and accompanying circumstances. *Washb. on Easem.* 551–6; *Crossley* v. *Lightowler, Law R. 3 Eq.* 279; *Ward* v. *Ward,* 14 *E. L. & E.* 413; *Queen* v. *Chorley,* 12 *Q. B.* 515; *Stokoe* v. *Singers,* 8 *E. & B.* 31.

The non-user in this case is accounted for on the ground that the company were obliged to refrain from any use beyond the demand. They had no option to use or not, further than the limit of the demand for the time being, and an intention to abandon any of their rights under the license as executed, cannot therefore, be drawn from a consistent use therewith, and a failure to violate its terms, and the provisions of the charter. The non-user in this case is peculiar. It is not a total non-user. The works were maintained and used, but the project was not as successful as expected, and the use was therefore only correspondingly limited, not given up. It is very different from where there is a total cesser of use, consequent upon a tearing down of works, or allow-

ing them to go to decay, or other circumstances from which an indication to relinquish the improvements may be drawn.

The fact that the original gates were not rebuilt, but culverts of much less size inserted, is explained by the evidence that the effort to replace them, even of smaller dimensions than the first, was not successful on account of a storm, and that the sluiceways and culverts were built only for a temporary purpose, and as a sufficient means at the time for the probable demand. It is evident from the testimony that the company had no intention to abandon any right, by not immediately replacing the first gates. Had the original gates been replaced, the diversion, as already stated, could not have exceeded the demand, and within that limit it could have made no difference to the owners below the dam, whether the diversion was through them, or the present culverts. There is nothing in the case from which an intention to abandon the right to use the works, as executed under the license, can be fairly drawn.

The remaining question on the merits is, whether the defendants should be enjoined from erecting their new gates, and extending their canal to them. The present culverts have always been, and are liable to obstructions by logs of wood, and rubbish, are out of view, and difficult to clear out and manage. Besides, the foundation is of quicksand, and the stone work about the gates is liable to fall, owing to the obstructions; there has been at times an insufficient supply of water. In order to obtain a good foundation, and to be relieved from the difficulty of the present culverts, the company have selected and purchased a site for new gates about ten chains above, where they can have shell rock for a foundation, and propose to extend the canal further, and to erect their gates. The point selected seems to be as near to the present head of the canal as practicable, to secure a good foundation. The gates, as proposed, will be two in number, and of the aggregate width of sixteen feet in the clear; about half the width of the original gates. It will

not be possible with them to divert as much water in volume as through the first gates, and they will not be equal to the capacity of the canal as already constructed, with the dam at the height of two and a half feet above the ordinary level of the water, as erected. The company would have no right to change the location of their gates, and extend their canal, or alter it so as to divert beyond the capacity of the canal as constructed, with the dam of the height as stated, but any alteration within those limits cannot affect the complainants. Whatever the size of the gates might be, the use must always be reasonably commensurate with the demand, and relief against any excessive use could be had. When the demand is liable to be increased by additional mills, factories, or works, such as the water power was intended to encourage, and in view of which the license was given, there would be no equity in compelling the company always to keep their gates of the exact size necessary for the immediate supply, and to submit to the expense of a change when more is required. The gates are not the test of the right to use the water, and whether the supply is through small or larger gates, cannot be questioned by the complainants, as long as they are within the limits of the capacity of the canal in its relation to the dam, as both were constructed. The fact of gates being built of larger capacity than necessary for the immediate demand, can no more be a cause of complaint by the owners below, than that the canal is larger than at present necessary, and the use of which was allowed, and expected to lie dormant until expanded by the growth and necessities of business.

The capacity of the new gates to divert water, with the canal extended, will clearly be within the limits of the capacity of the canal and dam as originally constructed, and also within the limits of the first gates. The extent of user must depend upon the demand, and the mere change in the mode of diversion does not prejudice the rights of the complainants. There is no present ground of complaint

against the new gates, and the extension of the canal to the site proposed.

On the merits, the decree of the Chancellor must be reversed, and the bill be dismissed with costs in both courts.

*For reversal*—BEASLEY, C. J., BEDLE, DALRIMPLE, DEPUE, KENNEDY, OGDEN, SCUDDER, VAN SYCKEL, VAIL, WALES, WOODHULL. 11.

*For affirmance*—OLDEN.